**MICHAEL ADAM CARNEAL**                                                    **PETITIONER**

**v.**

**COOKIE CREWS**                                                            **RESPONDENT**

## MEMORANDUM OPINION

### I. INTRODUCTION

Petitioner, Michael Adam Carneal, filed this action pursuant to 28 U.S.C. § 2254. His sole claim for relief is that he was not competent to plead guilty to murder, attempted murder, and burglary in 1998 due to an undiagnosed mental illness that he did not fully appreciate until several years later. Respondent has moved for dismissal of the petition on the ground that it is untimely under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d). Carneal does not deny that his petition is untimely on its face. He contends, however, that extenuating circumstances warrant equitable tolling.

Federal courts should respect their limited role in habeas cases. *See, e.g., Premo v. Moore*, – U.S. –, 131 S. Ct. 733, 741 (2011). Thus, at the outset, the Court emphasizes that determining Carneal's ultimate criminal responsibility for the December 1, 1997, shootings at Heath High School is not within its province. *Autry v. Estelle*, 464 U.S. 1, 3 (1983) (per curium) ("Federal courts are not forums in which to relitigate state trials."). "[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved." *Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923).

Just as the scope of habeas review in federal court is limited, so is the time frame a

convicted state prisoner has to seek that review. The AEDPA states that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). "This provision reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review." *Duncan v. Walker*, 533 U.S. 167, 179 (2001).

However, because the AEDPA's timeliness provision is not jurisdictional, it is subject to equitable tolling. *Holland v. Florida*, – U.S. –, 130 S. Ct. 2549, 2560, 2562 (2010). This means that a federal court may use its inherent equitable powers to consider the merits of an otherwise time-barred petition. *Id.* Federal courts grant equitable tolling sparingly, and the burden is on the petitioner to show that it is warranted. *Robertson v. Simpson*, 624 F.3d 781, 783-84 (6th Cir. 2010). Generally, equitable tolling is only appropriate in the rare and exceptional case in which the petitioner, despite his due diligence, is unable to file timely due to some extraordinary circumstance. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

This Court granted Carneal an evidentiary hearing on the equitable-tolling issue. The sole purpose of the hearing was to determine whether Carneal could present the type of evidence necessary to justify equitable tolling. While some of the proof introduced at the hearing related to Carneal's mental status at the time of the shootings, the Court did not grant the hearing to decide whether Carneal was competent to enter his guilty plea in 1998. At this juncture, the issue before the Court is the timeliness of Carneal's habeas petition. Carneal's mental condition *after* his incarceration and the effect it had on his ability to comply with the AEDPA's time limits are far more probative of this issue than is Carneal's mental state at the time of the

shootings.

After a careful review of the record, the Court concludes that Carneal has not demonstrated that he is entitled to equitable tolling. While there were certainly times during Carneal's incarceration that his mental state likely prevented him from filing a timely petition, the Court finds that eventually Carneal gained both the insight and ability to have filed a habeas petition. This likely took place in late 2002 or early 2003. Carneal did not file a habeas petition in this Court until February 2009. Carneal's delay shows a lack of diligence that cannot be excused. Accordingly, for these reasons, as more fully explained below, the Court will grant Respondent's motion to dismiss.

## II. FACTUAL AND PROCEDURAL HISTORY

In the fall of 1997, Petitioner Michael Adam Carneal was a fourteen-year-old freshman at Heath High School in McCracken County, Kentucky. He resided with his mother, father, and older sister, Kelly, a senior at Heath High School. In late November 1997, Carneal stole several guns from a friend's garage and hid them in his bedroom. On the morning of December 1, 1997, Carneal wrapped the guns in a blanket, loaded them into his sister's car, and then carried them into the school. Once inside the school, Carneal made his way to the main lobby where an early morning prayer group was just finishing up a meeting. Carneal opened fire on the students in the lobby. He killed three students and wounded five others. When another student approached Carneal and asked what he was doing, he dropped his weapon. Carneal then surrendered himself without further incident. Carneal was taken to the principal's office where he was turned over to law-enforcement officials.

After his arrest, Carneal was evaluated by a number of mental-health professionals

engaged by both the prosecution and the defense. The primary purpose of these evaluations was to determine Carneal's mental state at the time of the shootings and to assess whether he was competent to stand trial. In total, five experts examined Carneal. Two of the experts were engaged by Carneal's defense team. and the other three were hired by the Commonwealth.[1] All five experts agreed that Carneal was competent to stand trial. *See* DN 12, 9/3/1998 Cornell Rpt.; 5/27/1998 Schetky Rpt.; 7/17/1998 Benedek, Weitzel & Clark Joint Rpt. Additionally, while there was some disagreement among the experts regarding whether Carneal suffered from a mental impairment and, if so, the precise nature of the impairment, none of the experts concluded that Carneal was legally insane at the time of the shootings.[2] *Id.*

In October 1998, Carneal pleaded guilty but mentally ill in McCracken Circuit Court to three counts of murder, five counts of attempted murder, and first-degree burglary. Pursuant to the plea agreement, the trial court entered judgment on December 21, 1998, sentencing Carneal

---

[1]Carneal's counsel retained Drs. Dewey Cornell and Diane Schetky. Dr. Cornell diagnosed Carneal "as suffering from dysthymic disorder, rule out major depression, schizotypal personality disorder, rule out psychotic disorder such as schizophrenia or major depression with psychosis." DN 12, 9/3/1998 Cornell Rpt., at 29. Dr. Schetky diagnosed him as having "dsysthmia with traits of schizotypal personality disorder with borderline and paranoid fears." DN 12, 5/27/1998, Schetky Rpt., at 24. The Commonwealth retained Drs. Elissa Benedek, William Weitzel, and Charles Clark. They generated a joint report concluding that Carneal "was not mentally ill or retarded at the time of the shootings." DN 12, 7/17/1998 Benedek, Weitzel & Clark Joint Rpt., at 26.

[2]However, Dr. Cornell's report did point out that:

Michael's condition has fluctuated over time and [] he has not been fully cooperative in describing his paranoid fears and other symptoms. It is possible that Michael is in the early stages of Schizophrenia or Schizoaffective Disorder, which usually develop in early adulthood, but such a diagnosis would only be confirmed if he exhibits more clear-cut and unequivocal symptoms of psychosis, accompanied by a substantial decline in his day-to-day functioning.

DN 12, 9/3/1998 Cornell Rpt., at 30.

to life in prison without parole for at least twenty-five years.[3]

  Because Carneal was still a minor when he was sentenced, he was turned over to the Kentucky Department of Juvenile Justice (KDJJ) for placement in one of its facilities.  *See* KY. REV. STAT. § 640.030.  Carneal remained in the KDJJ's custody until he turned eighteen.[4]  The KDJJ ultimately decided to place Carneal at the Northern Kentucky Youth Development Center (NKYDC).  Carneal spent two and half years at NKYDC.

  While at the NKYDC, Carneal was treated by Dr. Kathleen A. O'Connor.  DN 114, 5-3:8-10.[5]  Dr. O'Connor had almost daily interaction with Carneal during this time.  DN 114, 5-3:20-22.  Initially, she concurred with Drs. Cornell's and Schetky's diagnoses of dysthymic and schizotypal personality disorders.  DN 114, 5-4:10-13.  However, after personally observing Carneal responding to visual and auditory hallucinations and exhibiting an increased level of hypervigilance, Dr. O'Connor changed her diagnosis to paranoid schizophrenia.[6]  DN 114, 5-8:1-25.

  Following a statutorily mandated sentencing hearing on his eighteenth birthday, Carneal was transferred from the KDJJ to the Kentucky Department of Corrections (KDOC) for

---

[3]Because he was a juvenile under sixteen at the time of the shootings, this was the maximum allowable sentence.  KY. REV. STAT. § 640.040.

[4]Carneal turned eighteen on June 1, 2001.

[5]The transcript of the evidentiary hearing is cited as "DN_,Vo1 #-Page #:Line #s."

[6]Carneal experienced a marked decompensation in 1999 following the Columbine School shooting, DN 114, 5-4:21-25, and a further decline after he gave a deposition in the civil case against him in 2000.  DN 114, 5-7:21-22.  Carneal twice attempted suicide during this time period.  DN 114, 5-5:5-6.  Following one of the suicide attempts, Carneal was transferred to a private treatment facility for a period of time.  *Id.*

placement in an adult-correctional facility.[7]  At the time of his transfer, KDJJ officials noted that Carneal was severely mentally ill and had developed paranoid schizophrenia.  Joint Exhibit 1, Vol. 11 at 2737-2741.  They recommended that Carneal stay on medication and receive treatment indefinitely.  *Id.*  The KDOC decided to place Carneal at the Kentucky State Reformatory (KSR) in LaGrange, Kentucky, where the Correctional Psychiatric Treatment Unit (CPTU) is located.[8]

After arriving at KSR, Carneal was initially placed in the CPTU.  DN 112, 3-146:8-25. In July 2002, while he still in the CPTU, Carneal's medical providers switched him to a new antipsychotic medication, Geodon.  DN 110, 1-54:3-5.  Carneal experienced a marked improvement on the new medication that allowed him to attain "some increased insight into his condition."  DN 110, 1-54:14-18.  It was during this time that Carneal first began corresponding with Dr. Cornell.  Joint Exhibit 1, Vol. 5 at 1224-59.

 On August 2, 2002, Carneal wrote to Dr. Cornell for the first time.  Joint Exhibit 1, Vol. 5 at 1225-26.  The impetus for the letter appears to have been Carneal's discovery of a book in the prison library co-authored by Dr. Cornell, *Juvenile Homicide*.  *Id.*  ("I was browsing through the library today and just happened to spot a book that you and Dr. Benedik had written together.").  In the letter, Carneal recounts his medical history while in prison.  *Id.*  He states:  "I

---

[7]Under KY. REV. STAT. § 640.030(2) a youthful offender, following his or her eighteenth birthday, must be returned to the sentencing court if time remains on his or her sentence.  The sentencing court must then make a determination and decide:  1) whether to place the youthful offender on probation or conditional discharge; 2) whether to return the youthful offender to the Department of Juvenile Justice for six months of additional treatment, followed by discharge; or 3) whether to place the youthful offender in an adult-correctional facility.

[8]CPTU houses inmates who have been adjudicated and convicted of a crime or crimes and have been diagnosed with a mental illness.  Kentucky Corrections Policies and Procedures § 18:11.

was most recently switched from Serequel [sic] to Genodon [sic]. I have been doing alot better. My fears still aren't gone, but they have been reduced." *Id.* He reports to Dr. Cornell that he obtained his high school diploma while still in the juvenile system, that he is impressed with KSR's library, and that he is starting a vocational program that includes an electronics class that he thinks is "pretty neat."[9] *Id.*

Carneal concludes his August 2, 2002, letter to Dr. Cornell by stating:

> The reason I wrote you this letter is actually to apologize for not being as truthful with you as I should have been. There were a lot things that I was embarrassed about. I know that you have not too many different sources of information when you are conducting an evaluation. I am sorry that I made it so difficult for you to believe me. The truth hurts sometimes. I am sorry that I allowed myself to conceal and distort some very important facts. Thank you for your time and effort.

*Id.*

Dr. Cornell responded to Carneal by letter August 8, 2002. Joint Exhibit 1, Vol. 5 at 1227. Among other things, Dr. Cornell invited Carneal to elaborate on the omissions and deceptions that Carneal referred to in his prior letter. *Id.* ("If there are important facts or conclusions in this report that are in error, I would be grateful for you to point them out. If there is something else I should have known, I would like to know that as well.").

A few days later, Carneal replied to Dr. Cornell.[10] Joint Exhibit 1, Vol. 5 at 1228-29.

Dr. Cornell, Ph.D.,

> Thank you for writing me back. I appreciate it. I know how busy you must be. There was one thing I forgot to tell you in my last letter. I have had a lot of free

---

[9]Carneal did not complete the vocational program. Since he has been incarcerated at KSR, however, he has completed between ten and eleven college-level courses. DN 112, 3-41:25 - 42:1-3.

[10]The Court considers Carneal's correspondence to be some of the best evidence of his mental state during the relevant time period. Accordingly, the Court quotes a few selected letters in their entirety.

time in the past years. I spend much time in self-reflection. I think about the past and the future. I was recently thinking about what went on when I was in kindergarten. I remembered a time when I wanted to bring a gun to show and tell, and whoever didn't like it, I was going to shoot them. Of course, I didn't have access to a gun, so it was not realistic. But I do believe that if I had had the means at the time, I would have gone that far. I also remembered that I have had my feelings of alienation ever since kindergarten. They weren't as strong as they became early middle-school, but they were there, and they affected the way I acted and the way I thought.

On another subject, I totally agree with your conclusions in your report. The only things that I have a problem with is this state's definition of insanity. I know that I am preaching to the choir on this one, but I just wanted to say this. Under the Kentucky State Penal Code, Chapter 504 insanity is defined as;

A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental illness or retardation, he/she lacks substantial capacity either to conform his/her conduct to the requirements of the law.

Does this statement mean that a person must appreciate the moral criminality or the legal criminality? I don't think that this can be answered by anyone other than the courts. It also states that his/her condition at the time of the crime applies, not after. I wonder about the culpability of any fourteen year-old. Sorry, again, I am telling the wrong person. I'm in no way thinking about filing an appeal. I just feel the justice system is a bit out of wack on this issue.

Well once again, thanks for taking the time to read this letter and to have written me back.

Sincerely,

Michael Carneal

*Id.*

Dr. Cornell did not immediately respond to this letter. Nevertheless, Carneal wrote Dr.

Cornell again on December 25, 2002. Joint Exhibit 1, Vol. 5 at 1231.

Dr. Cornell, Ph.D.,

Sir, I am writing to you for two reasons. The first is to tell you how well I am doing under these circumstances. About two months ago I was on 6 different medicines, but they have recently lowered it down to two; Zoloft and Geodon. The Geodon has done wonders for me. I really like it. I realize that I am dependent upon the meds to maintain a normal level of functioning. I missed my medicines one time

and got into really bad shape. I was running around in my boxers complaining about how cold it was. I saw a guy with a can opener and thought it was a gun. I starting ducking behind the partition. I even almost got into a fight for the first time in years because I thought a bunch of people were going to try and beat me up. Anyway, I need my meds in order to maintain any degree of functioning. But, I don't have any problems taking my meds and it works out okay. I am set for release from the Correctional Psychiatric Treatment Unit in the next few months. I am really looking forward to being in the general population. I will have many more privileges and opportunities. The CPTU program focuses mainly on correcting criminal behavior and doesn't make any effort at all to address my mental illness beyond seeing a psychiatrist and getting medication. I think that there is more to treatment than that. I think that part of the reason I have been doing so well is because I have found someone I can trust. Her name is Valerie and I feel that she is genuine. It has taken a lot to get to this point. I am hoping that someday we can get married. She says that she'll say yes, when I ask her. I love her, and that is something that I never thought possible for me. I don't know if the medicine has enabled me to feel this way, but I think that that plays a huge part in it.

The second reason I was writing to you is to explain to you the different ways that I deceived you when you talked to me. I realize that I was only hurting myself when I lied to you, but here's the situation.

I was utterly convinced that a rogue confederation of monsters and people were banded together to monitor everyone. I called them "danes". I know that this sounds bizarre, but hang with me for a moment while I explain more in depth. I believed that I was the only person aware of their presence due to a strange psychic ability that I was born with. They wanted to kill me because I knew about them, just as they had everyone else who was born with this special gift. I thought that if I told you about them that they would kill me. So I decided to make it seem as if I was slightly delusional and then you wouldn't believe me. If you believed me then they would find out about my talking to you and kill me. I remember someone asking me why I would rock back and forth in my chair all of the time. It was to prevent my feet from touching the floor. I was caught up in this belief until the year of 2000. I still see the people and the hand coming out from underneath my bed, but I'm better able to realize that they are not really there. I can tell you incident after incident in which I saw, heard, felt, smelt, or even tasted things that weren't really there. I don't call them hallucinations. It is merely my mind playing tricks on me. I also realize how absurd this all sounds. I am no dummy. I know that you are probably thinking that this is some crazy scheme that I have spent the last five years concocting in order to appeal in court.

That isn't what this is. I am merely informing you of my mental illness and seeking your opinion on whether or not I need better treatment than I am receiving. I was under the impression all through court that I would receive proper mental health

treatment.  I am receiving nothing different than what the rest of the population receives.  Regardless, of the court's finding that I am mentally ill.

Thank you for your time.  I appreciate everything you have done for me.

Sincerely

Michael Carneal

*Id.*

Carneal claims that in early 2003, his condition deteriorated and that he was not stable again until late 2003 or early 2004, shortly before he filed his Kentucky Rule of Criminal Procedure (RCr) 11.42 motion in state court on June 1, 2004.  During the evidentiary hearing, however, Carneal testified that he believes that he could have told his attorneys the information that forms the basis for his appeal sometime in the winter or fall of 2003:

> Q.   At what time since then would you say you were mentally able to tell your attorneys about the claims you are now advancing?
>
> A.   Sometime in 2003.
>
> Q.   Do you mean summer 2003?
>
> A.   No. Sometime.
>
> Q.    I'm asking, can you put any -- give me any more definite answer?
>
> A.   Maybe fall or winter is what I would say. I don't know.  I'm not too good with timelines.
>
> Q.   So fall or winter 2003, you could have told your attorneys about the Danes, correct?
>
> A.   Yeah. I think that's when it started, yeah.

DN 112, 3-53:8-19.

Additionally, sometime prior to August 2003, Carneal wrote a remarkably coherent and

detailed letter to Rebecca DiLoreto, an attorney with the Kentucky Department of Public

Advocacy, in response to a scholarly legal article she authored that was published in the spring

2003 edition of the Kentucky Children's Rights Journal. Joint Exhibit 1, Vol. 5 at 1231.

> To: Ms. Rebecca DiLoreto
> Re: Examining an Attorney's Obligation to Raise Competency Issues on Behalf of a Child Client in Juvenile Court, article in Kentucky Children's Rights Journal, Volume X Number 1 Spring 2003

Dear Rebecca Ballard DiLoreto, Esq.:

Someone recently sent me a copy of the Kentucky Children's Rights Journal. I was excited when I came across your article, as it is something that certainly applies to me and my case. It was a very informative article with lots of information that might be relevant to my situation. I quickly typed out a letter to the Children's Law Center in an effort to get in contact with you. I have some questions to ask you.

First, let me explain my situation. I was arrested on December 1, 1997 for the shooting deaths of three of my peers and for wounding five others. It happened at school. I would actually be surprised if you hadn't heard about it. It made international headlines. Later that day I was taken into a juvenile court and then within minutes it was decided to send my case to adult court. I later read that there are three guidelines for a juvenile to be tried as an adult (at least 14, a gun was involved, and I was charged with a felony), but I am not sure if this is true because I read it in a news article. I believe that this is important because you said in your article that "When Kentucky's transfer statute is applied mechanistically to declare it appropriate to transfer the cases of adolescents to adult court without a full consideration of the competency of that child, the law operates in violation of the constitution." That is the one thing that stuck out of your article. I believe that the transfer of my case should be considered mechanistic. In adult [court] there were several hearings about things that I have no clue about. My lawyer did all the talking. Eventually a trial date was set, after I was evaluated by about five doctors. From reading the reports I have formed the opinion that all the times I was evaluated, none of the doctors ever considered that I might not understand what was going on. It seems to me that [they] only looked [at] the possibility of insanity and mental retardation. Now I haven't asked them about it. But, from reading the statements in the reports it doesn't look like they considered my competency as related to a 14 year old who had led a very sheltered life. Although my dad was [a] lawyer, he never talked about his work and my entire limited knowledge of the legal [system] came from watching movies. But, the day the trial was supposed to start my lawyer mislead [sic] me into signing a plea agreement for the maximum possible sentence. I neither understood what I was signing nor understood what my lawyer was telling

me about it. All I know is that I pled "guilty but mentally ill" and received the maximum sentence. I wrote my lawyer several times. Once I asked about filing an appeal. He said that my only option was an 11.42 and that for that I needed a new lawyer. But, since I have had to file bankruptcy for the $42,191,488 I owe no other lawyers want to help me out. I have no way to pay them. The inmate legal aides that are employed here ask for payment in cigarettes and are only motivated by greed. I also wrote my lawyer and tried to get copies of several documents pertaining to my case. He wrote me back and said he wanted two-thousand dollars to get me the documents I requested. I wrote the court clerk. I wrote the prosecutors's office. I can't even get copies of documents related to my case. I don't know what to do.

The reason I am writing to you is to ask you about what your article says. If waiving my case up to adult court without an examination into my competency is unconstitutional, what should I do? What should I file? Do I need a lawyer? How do I get one without any money? If I have to do this on my own do you have any other information that might be relevant? I saw in your endnotes a reference to a book called "Juvenile Competence In Adult Prosecutions: More than a Matter of IQ and Mental Illness." Where can I find this book? Where can I find a copy of the U of L Journal of Family Law from 1995 you referenced? Are there any other articles or books that might help me? Any help you might offer in this matter would be deeply appreciated.

Michael Carneal

*Id.*

In 2004, Carneal's current counsel contacted Drs. Cornell and Schetky and asked them to formally reevaluate Carneal. Dr. Schetky concluded in her revised report that:

Michael was seriously mentally ill at the time of his crime. However, owing to the nature of his paranoid delusional system he was not able to reveal the full extent of his delusion, confused mental state, and his hallucinations to his forensic examiners. This, in turn, affected their ability to arrive at the correct diagnoses and to adequately assess issues of criminal responsibility. Having recently spoken with Michael and reviewed his psychiatric records, it is now my opinion that, as a result of Paranoid Schizophrenia, he lacked substantial capacity to appreciate the criminality of his conduct at the time of his crime. In regard to Michael's capacity to conform to requirements of the law, he appears to have been acting in response to command hallucinations, which he was not able to resist.

Joint Exhibit 1, Vol. 5 at 3767-71. Interestingly, Dr. Schetky noted in her report that "during the week of 12/9/2002, Michael tells the psychologist he sees in group therapy that he believes that he was mentally ill when he committed his crime." *Id.*

Dr. Cornell concluded in his May 31, 2004, report that: "[the] original diagnosis was incorrect; that [Carneal] did, in fact, suffer from paranoid schizophrenia; that my opinion that he was competent to stand trial in 1998 was not correct and that, in fact, he was not competent at that time; and that my opinion was that his criteria for criminal responsibility in terms of his degree of impairment, known criminality of his actions, and being able to control his behavior, conform his behavior to the requirements of the law had been incorrect."[11]  Joint Exhibit 1, Vol. 5 at 3772-90.

On June 1, 2004, three years to the day of his eighteen-year-old hearing, Carneal, acting with the assistance of counsel, moved for relief from his judgment in McCracken County Circuit Court.  DN 12 at 285.  Carneal did not file anything in federal court at this time.  Carneal advanced alternative procedural bases for the relief in state court.  Under RCr 10.02 and 10.06, he sought a new trial on the ground of newly discovered evidence.  *Id.*  Under RCr 11.42 he sought relief from his judgment on the ground that his guilty plea was invalid both because he was incompetent to enter it and because counsel was ineffective in recommending it.  *Id.*  Finally, under Kentucky Rule of Civil Procedure (CR) 60.02 (f) he sought relief from his judgment on the ground that the belated discovery of his insanity constitutes an extraordinary justification for relief.  *Id.*

The timeliness of Carneal's 2004 motion was a hotly contested issue from the outset.

---

[11]Dr. Cornell authored a supplemental report dated October 26, 2009.  Dr. Cornell's supplemental report primarily summarizes and clarifies portions of his May 31, 2004, psychological evaluation of Carneal.   Specifically, in the supplemental report Dr. Cornell clarifies that it is unequivocally his professional opinion that "Michael Carneal's schizophrenic mental illness at the time of the offense caused him to lack substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law."  Joint Exhibit, Vol. 5 at 3791-3801.

The Commonwealth moved to dismiss Carneal's motion on the ground that it was untimely under all asserted grounds because the statutory time period ran from the date of Carneal's judgment of conviction, not from the date of the eighteen-year-old hearing. DN 12 at 301. The McCracken Circuit Court ultimately agreed with the Commonwealth and dismissed Carneal's motion as untimely. DN 12 at 317. The trial court also noted that substantively the motion was "otherwise refuted by the record." *Id.* The trial court denied Carneal's motion on June 30, 2004.

Carneal appealed as a matter of right to the Kentucky Court of Appeals. Upon review, the Kentucky Court of Appeals held that Carneal's RCr 11.42 motion was timely filed within three years of his majority, and his motion presented sufficient evidence to raise real and substantial doubts concerning his competence to plead guilty. *Carneal v. Commonwealth*, No. 2004-CA-001534-MR, 2006 Ky. App. LEXIS 157 (Ky. Ct. App. May 26, 2006). The Kentucky Court of Appeals concluded, however, that Carneal's RCr 10 and CR 60.02 claims were untimely. *Id.* On May 26, 2006, the Kentucky Court of Appeals vacated the McCracken Circuit Court's order as it related to the RCr 11.42 claims and remanded the case back to the trial court to determine whether a retrospective competency hearing was permissible and, if so, to conduct such a hearing. *Id.*

The Supreme Court of Kentucky granted the Commonwealth's motion for discretionary review. *Commonwealth v. Carneal*, No. 2006-SC-0653-DG, 2007 Ky. LEXIS 53 (Ky. Mar. 14, 2007). Carneal then sought permission to cross-appeal the issue of the timeliness of his RCr 10 and CR 60.02 claims. The Supreme Court of Kentucky also granted discretionary review on these issues. *Carneal v. Commonwealth*, No. 2007-SC-0203-DG, 2007 Ky. LEXIS 108 (Ky. May 16, 2007).

The Supreme Court of Kentucky first addressed Carneal's RCr 11.42 claims that "he was mentally incompetent to plead guilty, and that his counsel was incompetent for advising him to accept the plea agreement." *Commonwealth v. Carneal*, 274 S.W.3d 420, 426 (Ky. 2008). After a quite lengthy analysis, the Supreme Court of Kentucky concluded that "Carneal's RCr 11.42 motion is untimely, as it was filed more than three years after his sentencing." *Id.* As such, it reversed the Kentucky Court of Appeals with respect to all claims presented in the RCr 11.42 motion. *Id.* at 433. It also concluded that Carneal's CR 60.02 and RCr 10 claims were untimely and affirmed the Kentucky Court of Appeals decision as related to those claims. *Id.* Carneal moved for a rehearing; the Kentucky Supreme Court denied his motion on February 19, 2009.

Carneal then filed the instant habeas action in this Court on February 25, 2009. His petition asserts a single claim, "he was not competent to plead guilty [in 1998] due to an undiagnosed mental illness." DN 1 at 1. Respondent moved to dismiss the petition as untimely. DN 10. Carneal then moved the Court for an evidentiary hearing on equitable tolling. Upon review of Carneal's petition and its attachments, the Court found that Carneal had presented a "colorable claim" for equitable tolling. As such, the Court granted Carneal's request for an evidentiary hearing on the equitable-tolling issue as it had not been fully developed in the state court record.[12] DN 32.

The evidentiary hearing was conducted on March 14-18, 2011. The primary purpose of the hearing was to determine whether an extraordinary circumstance prevented Carneal from timely filing a habeas petition and, if so, whether Carneal acted with reasonable due diligence

---

[12]The Court then stayed this action temporarily pending a decision by the United States Supreme Court in *Holland v. Florida*, on whether equitable tolling could be permissibly applied to extend 28 U.S.C. § 2244(d)(1)'s time limits. DN 38. The stay was lifted when the Supreme Court ruled that equitable tolling was available in habeas actions.

once he was able to file. In total ten witnesses testified at hearing. Carneal testified on his own

behalf as did his father and sister. Carneal also called Drs. Cornell, Schetky, Moore, and

O'Conner. The Commonwealth called Drs. Granacher, Clark, and Benedek to testify on

Respondent's behalf. Additionally, the parties submitted a multi-volume Joint Exhibit

containing several thousand pages worth of Carneal's prison, medical, and other miscellaneous

records.

### III. ANALYSIS

The AEDPA provides a one-year statute of limitations for filing a petition for a writ of

habeas corpus. 28 U.S.C. § 2244(d)(1). "The AEDPA statute of limitation promotes judicial

efficiency and conservation of judicial resources, safeguards the accuracy of state court

judgments by requiring resolution of constitutional questions while the record is fresh, and lends

finality to state court judgments within a reasonable time." *Day v. McDonough*, 547 U.S. 198,

205-06 (2006) (internal quotation marks omitted).

The AEDPA's one-year statute of limitations begins to run from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review
or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State
action in violation of the Constitution or laws of the United States is removed, if the
applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by
the Supreme Court, if the right has been newly recognized by the Supreme Court
and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could
have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). "The time during which a *properly* filed application for State

post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2) (emphasis added).

Carneal concedes that his petition for habeas corpus, filed February 25, 2009, is technically untimely under § 2244(d)(1).[13]  Nevertheless, he argues that this Court should use its equitable powers to toll the statute of limitations because his mental illness prevented him from filing a timely petition.[14]

## A.    Legal Standard:  Equitable Tolling Due to Mental Impairment/Illness

Because the AEDPA's statute of limitations is not jurisdictional, a federal court can use its equitable powers to review a petition that is technically untimely.  *Holland v. Florida*, 130 S. Ct. at 2562 ("[W]e therefore join the Courts of Appeals in holding that § 2244(d) is subject to equitable tolling.").  "Federal courts have typically extended equitable relief only sparingly." *Sherwood v. Prelesnik*, 579 F.3d 581, 588 (6th Cir. 2009) (quoting *Griffin v. Rogers*, 399 F.3d 626, 635 (6th Cir. 2005)).  "[A] litigant seeking equitable tolling bears the burden of establishing

---

[13]Carneal previously asserted that his petition was timely under § 2254(d)(1)(D) and (2).  DN 1, at 9-13.  He appears to have abandoned any such contention.  His post-hearing brief states:  "Carneal filed this action outside the one-year time period established by 28 U.S.C. §2244(d)(1)."  DN 120 at 1.  This on-the-record concession by Carneal moots his previous assertions of timeliness under § 2244(d).

[14]In his habeas petition and his initial response to Respondent's motion to dismiss, Carneal also asserted that he was entitled to equitable tolling under the actual innonence doctrine.  Actual innonence can serve as the basis for equitable tolling.  *See Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995)).  To prevail on an actual innonence claim for equitable tolling, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. at 327.  In his post-hearing brief, Carneal concedes that he cannot meet this standard.  DN 120 at 45, n.324 ("Petitioner drops his claim that he is actually innocent of the offense.  Although he has proven past preponderance that he was not criminally responsible for his crimes, Petitioner acknowledges that he cannot meet the standard that no reasonable juror would convict him.").  As such, this claim is also now moot, and the Court need not address it further.

two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."[15] *Holland v. Florida*, 130 S. Ct. at 2562-63 (quoting *Pace v. DiGuglielmo*, 544 U.S. at 418). The equitable-tolling analysis is fact intensive, and "courts must consider equitable tolling on a 'case-by-case basis.'" *Griffin v. Rogers*, 399 F.3d at 635 (internal citations omitted).

Mental illness is not a *per se* reason to toll the AEDPA's statute of limitations. *McSwain v. Davis*, 287 F. App'x 450, 457 (6th Cir. 2008). However, it can serve as the basis for equitable tolling in appropriate circumstances. *Id.* "Several courts of appeal have held that for the mental incapacity of a petitioner to warrant equitable tolling of a habeas statute of limitations, the petitioner must demonstrate that the incompetence affected his or her ability to file a timely habeas petition." *Robertson v. Simpson*, 624 F.3d at 785 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010); *Hunter v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009); and *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2003)). In other words, the petitioner must affirmatively demonstrate "a causal connection between [his] mental illness and [his] ability to file a timely federal habeas petition." *McSwain v. Davis*, 287 F. App'x at 457.

Even though the Sixth Circuit recognizes that mental illness can justify equitable tolling if the petitioner establishes a casual connection between his mental condition and his inability to timely file, *id.*, its law in this area remains largely undeveloped and offers very little in the way

---

[15]Prior to *Holland*, the Sixth Circuit considered five factors when determining whether to toll the statute of limitations. *See Dunlap v. United States*, 250 F.3d 1001 (6th Cir. 2001). "However, *Holland* clarified that requests for tolling under AEDPA are reviewed under a two-part test." *Robinson v. Easterling*, No. 09-5447, 2011 U.S. App. LEXIS 10416, at *7, n.1 (6th Cir. May 20, 2011).

of precedential guidance.[16]  This Court has surveyed the case law of the other federal circuit courts[17] and concludes that the Ninth Circuit has one of the most well-developed and articulate standards for evaluating equitable tolling on account of mental illness in the habeas context.

The Ninth Circuit recently summarized its framework in such cases as follows:

> We conclude that eligibility for equitable tolling due to mental impairment requires the petitioner to meet a two-part test:
>
>> (1) First, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control by demonstrating the impairment was so severe that either
>>
>>> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>>>
>>> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>>
>> (2) Second, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

*Bills v. Clark*, 628 F.3d 1092, 1099-1101 (9th Cir. 2010) (internal citations omitted).

To properly apply this framework, a court must engage in a four-step analysis: "(1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during

---

[16] In *Holland v. Florida*, the Supreme Court noted that "courts of equity can and do draw upon decisions made in other similar cases for guidance."  130 S. Ct. at 2563.

[17] *See ,e.g.*, *Riva v. Ficco*, 615 F.3d 35, 37 (1st Cir. 2010); *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010); *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001) (overruled in part on other grounds by *Carey v. Saffold*, 536 U.S. 214 (2002)); *United States v. Sosa*, 364 F.3d 507, 513 (4th Cir. 2004); *Smith v. Kelly*, 301 F. App'x 375, 377 (5th Cir. 2008); *United States ex rel. Flowers v. Gaetz*, No. 09C1303, 2010 U.S. Dist. LEXIS 11591 (D. Ill. Feb. 10, 2010); *Nichols v. Dormire*, 11 F. App'x 633, 634 (8th Cir. 2001); *Calderon v. United States Dist. Court for the Cent. Dist. of Cal.*, 163 F.3d 530, 541 (9th Cir. 1998) (en banc) (overruled in part on other grounds by *Woodford v. Garceau*, 538 U.S. 202, 205 (2003)); *Wiegand v. Zavares*, 320 F. App'x 837, 839 (10th Cir. 2009); *Lawrence v. Florida*, 421 F.3d 1221, 1226-27 (11th Cir. 2005).

the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering

the record, whether the petitioner satisfied his burden that he was in fact mentally impaired;

(3) determine whether the petitioner's mental impairment made it impossible to timely file on his

own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise

diligent in attempting to comply with the filing requirements." *Id.* at 1101.

The Ninth Circuit's standard is consistent with and a logical expansion of the Sixth

Circuit's casual-connection requirement. Thus, the Court will follow the Ninth Circuit's general

framework to assist it in determining whether Carneal has demonstrated both 1) a "casual

connection" between his alleged mental impairment and his failure to file his petition within

§ 2244(d)(1)'s time limits; and 2) that he acted with the requisite due diligence.

**B.    Application to Carneal's case**

**1.    Non-frivolous showing of a mental impairment**

The Court previously decided the first step in Carneal's favor and conducted an

evidentiary hearing. The Court is now in a position to properly evaluate whether Carneal can

satisfy the remaining three elements. In doing so, the Court relies heavily on the testimony and

exhibits introduced during the evidentiary hearing**.**

**2.    Did Carneal suffer from a mental impairment during the statutory filing period?**

The parties have vigorously debated the exact nature of Carneal's mental impairment, if

any. The Court finds Carneal's medical records from prison (both juvenile and adult) and the

testimony from his treating physicians in prison, Drs. Moore and O'Connor, to be the most

credible and persuasive on this point. While there is certainly not uniform agreement, the

records and the treating doctors indicate that Carneal has consistently been diagnosed with and

treated for some type of major mental disorder related to paranoia, delusional thoughts, and depression since his entry into the penal system in 1998.

Various of Carneal's treating psychiatrists and psychologists have put different labels on his condition over time. That Carneal has been given differing diagnoses is not terribly significant to the Court. What is important is that despite the disagreement among the doctors and the experts that testified at the evidentiary hearing, no one can dispute that for over a decade Carneal has been under the care of psychiatrists and psychologists that have consistently regarded him as mentally ill and treated him as such. Additionally, since his entry into the adult prison system, Carneal has either been housed in CPTU or in a dorm for mentally-ill inmates.

Based on the testimony and the other evidence introduced into the record, the Court concludes that from the time of his initial incarceration in 1998 to the present date Carneal has suffered from some sort of chronic mental illness that causes him to experience delusions, paranoia, depression and the like. Thus, the Court resolves the second step in Carneal's favor.

**3.    Did Carneal's mental illness make it impossible for him to file a timely habeas petition?**

The Court must next consider whether Carneal's mental impairment made it impossible for him to file a timely habeas petition on his own or to utilize the assistance reasonably available to him to do so. To make this determination, the Court must first establish the date Carneal would have had to have filed a habeas petition for it to be timely under § 2244(d). Under subsection § 2244(d)(1)(A) Carneal had one  year from "the date on which the judgment [against him] became final by the conclusion of direct review or the expiration of the time for seeking such review." The question here is whether the year under § 2244(d)(1)(A) runs from

the date of Carneal's original judgment on December 21, 1998, or from the date of his KY. REV. STAT.

§ 640.030(2) youthful-offender sentencing hearing.

"[F]inality for the purpose of § 2244(d)(1)(A) is to be determined by reference to a uniform federal rule." *Clay v. United States*, 537 U.S. 522, 531 (2003). The Supreme Court has held that for the purpose of AEDPA: "Final judgment in a criminal case means sentence. The sentence is the judgment." *Burton v. Stewart*, 549 U.S. 147, 156 (2007). Applying *Burton* in the context of a youthful offender subject to KY. REV. STAT. § 640.030, another court in this district has held that the AEDPA statute of limitations does not begin to run until after the state court reaffirms the sentence as part of the required KY. REV. STAT. § 640.030(2) hearing after the offender turns eighteen. *See Jennings v. Morgan*, No. 3:06-CV-P309-S, 2009 U.S. Dist. LEXIS 118577 (W.D. Ky. Dec. 17, 2009).

This Court agrees with the *Jennings* court's analysis of KY. REV. STAT. § 640.030. Although the circuit court's review of Carneal's sentence at the eighteen-year-old hearing was somewhat limited, it did have the discretion under KY. REV. STAT. § 640.030(2) to have modified Carneal's sentence by placing him on "probation or conditional discharge." KY. REV. STAT. § 640.030(2). This is significant because otherwise Carneal would not be eligible for parole until he had served twenty-five years.

Thus, Carneal's sentence was not fixed for the purposes of the AEDPA until after the statutory rehearing. That rehearing took place on June 1, 2001. Theoretically, Carneal had thirty days from the June 1, 2001, rehearing to seek review under RCr 12.04. That period expired on Monday, July 2, 2001. Carneal then had 365 days from that date in which to file a habeas

petition pursuant to 28 U.S.C. § 2254. That period expired on Monday, July 2, 2002. In sum, the Court finds that the statutory period under 28 U.S.C. § 2244(d)(1)(A) ran from July 2, 2001, through July 2, 2002. Thus, the Court must determine whether Carneal's mental illness kept him from filing a habeas petition during this time frame.

Carneal's medical records from NKYDC and Dr. O'Connor's testimony indicate that at the time that Carneal was transferred to the KDOC's custody in June 2001, he was seriously mentally ill. He was placed in the CPTU on suicide watch for a substantial period of time following his transfer to adult incarceration. Carneal described the adjustment from the juvenile facility to adult incarceration as extremely difficult. DN 112, 3-45:22-35 - 46:20-23.

Based on its review of the record, the Court concludes that Carneal's mental illness made it extraordinarily difficult, if not practically impossible, for him to have filed a habeas petition in the period from July 2, 2001, to July 2, 2002.

### 4. Under the circumstances did Carneal act diligently in filing his habeas petition?

The last step requires the Court to determine whether Carneal acted diligently in filing his habeas petition after he became able to do so. This final step is arguably the most important. "Diligence is the key to equitable tolling." *Huey v. Smith*, 199 F. App'x 498, 502 (6th Cir. 2006) (internal quotations omitted). The diligence required for equitable tolling purposes is "'reasonable diligence,' not 'maximum feasible diligence.'" *Holland v. Florida*, 130 S. Ct. at 2565 (internal citations omitted).

While equitable tolling can be used to excuse some delay, even equity has its limits. Equity cannot be used to keep a statute of limitations tolled into perpetuity. Equity does not "convey a right to an extended delay while a habeas petitioner gathers every possible scrap of

evidence that might support his claim." *Jurado v. Burt*, 337 F.3d 638, 644 (6th Cir. 2003).

Rather, a petitioner relying on equitable tolling to save an otherwise time-barred habeas petition

must demonstrate that he acted promptly in asserting his *federal* rights once the impediment that

prevented him from filing has been lifted. *Allen v. Yukins*, 366 F.3d 396, 404 (6th Cir. 2004);

*Cook v. Stegall*, 295 F.3d 517, 522 (6th Cir. 2002). "Equitable tolling does not restart the period

of limitations . . . it permits deferral of suit until the tolling event ceases and requires diligent

action thereafter." *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 379 (7th Cir.

2010) (citing *Pace v. DiGuglielmo*, 544 U.S. at 418-19).

The record shows that Carneal began to gain insight into his mental condition in late July

or early August 2002. Carneal's August 2002 letters to Dr. Cornell show that he had read the

reports related to his mental evaluations and consciously understood both that he had withheld

certain facts from Dr. Cornell that would have impacted the evaluations performed on him in

1998 and that those evaluations related his legal culpability and competency. By December

2002, Carneal was able to discuss with Dr. Cornell the facts that he withheld from him, including

Carneal's belief in 1997 and 1998 that the Danes were real and were directing his actions. The

medical records also indicate that even prior to 2002, Carneal had been able to discuss various

auditory, olfactory, and visual hallucinations with his medical providers such as Dr. O'Connor.[18]

Even Carneal himself testified that by the winter of 2003, he could have told his attorneys about

---

[18]Carneal goes out of his way to indicate that prior to 2002, he had not disclosed the Danes to anyone other than Dr. Cornell. However, the gravamen of Carneal's habeas petition is that he was not competent to plead guilty. The Court's understanding of Dr. Cornell's report is that the existence of any hallucination would have enabled him to give Carneal a more serious diagnosis that could have rendered him incompetent to plead guilty. Thus, Carneal's ability to appreciate and discuss his hallucinations in general is more significant to the current issues than Carneal's willingness to discuss the Danes with people other than Dr. Cornell.

his mental state.

Additionally, Carneal's letter to Rebecca DiLoretto indicates that Carneal appreciated prior to August 2003 that he could have challenged his conviction in a collateral proceeding.[19] He was especially interested in challenging his competency to be tried as a adult. Carneal's letter to Ms. DiLoretto also indicates that prior to August 2003 Carneal had contacted lawyers about his case and the possibility of challenging his sentence and had on at least one occasion sought assistance from prison legal aides. The letter also demonstrates that Carneal was able to read fairly complicated legal materials and draw connections between those materials and his case.

Carneal's letters and activities during the relevant time show a level of competence and understanding far above the Sixth Circuit's threshold for establishing equitable tolling. *See Cobas v. Burgess*, 306 F.3d 441, 443 (6th Cir. 2002). The Court finds that Carneal had the ability, insight, and relative competence to have drafted a habeas petition on his own behalf in late 2002/early 2003 or to have worked with outside counsel to do so.

This is not to say that Carneal was "cured" in 2002. To the contrary, the Court accepts that Carneal has a chronic mental illness of some sort that is treatable, but not curable. While Carneal may have certainly had a number of "bad days" during this period, his letters and testimony indicate that he also had a number of good ones. He was able to complete classes, read and understand a fairly complex journal article about juvenile rights in the criminal justice system, obtain the addresses of people he wished to correspond with further about his legal

---

[19]There is some debate as to when Carneal wrote this letter. Carneal did not date the letter. It is stamped August 1. However, that stamp appears to have been placed on the letter when it was received. Since the article referred to in the letter was published in the Spring 2003 volume, we can assume it was written sometime between the spring of 2003 and August 1, 2003.

rights, and communicate with the outside world in a remarkably clear and concise manner.

While Carneal still suffered from a mental illness in the late 2002/early 2003 period that possibly made it more difficult for him to file a habeas petition, the record belies his assertion that he was completely unable to do so until 2004.[20] *Turner v. Mills*, 219 F. App'x 425, 429 (6th Cir. 2007) ("Turner does not explain how his mental and physical limitations, which no doubt made pursuing his rights more difficult, prevented him from diligently pursuing those rights altogether. Thus, this factor weighs against equitable tolling.").

Indeed, the evidentiary hearing itself is proof that Carneal can function from one day to the next even while actively experiencing symptoms of his mental disorder. While testifying at the evidentiary hearing, Carneal indicated that the day prior to giving his testimony, he heard voices in his head telling him that the man on the stand was not his father. DN 112, 3-4:5-14 ("When my dad came in the courtroom, I heard in my head that wasn't my dad, and I just kept thinking to myself, 'Well that's him, that's him.' And then when he got up here and he started talking, I heard in my head that wasn't his voice and it didn't sound like his voice."). On the day of his testimony, however, Carneal appeared alert, orientated, and able to assist his counsel in presenting his case to the Court.

Despite having gained the insight and ability to file a habeas petition in late 2002 or early 2003, Carneal waited until June 1, 2004, to file anything. This was almost eighteen months after Carneal had first divulged the existence of the Danes and their role in his behavior and actions to

---

[20]Whether Carneal desired to file a habeas petition at that time is an entirely different matter. Certain testimony indicated that Carneal feels a deep sense of remorse about the shootings and believes that he deserves to be punished. His guilt and remorse may have impeded his desire to challenge his sentence until counsel encouraged him to do so. A moral aversion to challenging his sentence, however, is quite a different matter than an actual mental impediment.

Dr. Cornell. Such a lengthy delay is unreasonable. *See Allen v. Yukins*, 366 F.3d 3at 404; *Cook v. Stegall*, 295 F.3d at 517; *Dunlap v. United States*, 250 F.3d at 1010. Because Carneal did not act promptly in asserting his rights once his mental condition improved in late 2002, he cannot rely on equitable tolling.

## C.     The 2004 state-court filing

Alternatively, even if the Court had concluded that Carneal acted diligently in filing something by 2004, it is worth noting that what Carneal actually filed was not effective to preserve his federal rights. Carneal did not file a federal habeas petition in 2004; he filed a collateral attack in state court. Equitable tolling, however, is focused on promptness in asserting one's *federal* rights, not one's state court rights. *See e.g.*, *Fuller v. Thomas*, 110 F. App'x 496, 499 (6th Cir. 2004) (stating that the petitioner had inappropriately "focuse[d] on his diligence in pursuing Ohio state court relief, not federal habeas relief"). Even more problematic is the fact that Carneal's state court filing was ultimately deemed untimely by the Supreme Court of Kentucky. Therefore, it was not "properly" filed for the purposes of § 2244(d)(2).

Filing a post-conviction motion in state court does not restart § 2244(d)(1)'s one-year statute of limitations. *Vroman v. Brigano*, 346 F.3d 598 (6th Cir. 2003). "The tolling provision does not []'revive' the limitations period (*i.e.*, restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Id.* at 602 (quoting *Rashid v. Khulmann*, 991 F. Supp. 254, 259 (S.D.N.Y. 1998)) (internal quotation marks omitted); *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001) ("[A]lthough the filing of the motion for a delayed appeal may have tolled the running of the one-year statute, it did not cause the statute to begin running anew when

the state court denied the motion."). Thus, Carneal's state filing (irrespective of its timeliness) did not restart the already expired statutory time period.

Second, Carneal's argument in favor of equitable tolling presupposes that he is entitled to rely on § 2244(d)(2) that excludes from the limitation period "the time during which a *properly* filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id.* (emphasis added). In *Pace v. DiGuglielmo*, however, the Supreme Court held that a state post-conviction petition rejected by the state courts on timeliness grounds is not "properly filed" and is therefore not subject to statutory tolling under § 2244(d)(2). 544 U.S. 408.

The *Pace* court was not persuaded by the petitioner's argument challenging the fairness of the decision to the extent a "petitioner trying in good faith to exhaust state remedies may litigate in state court for years only to find out at the end that he was never 'properly filed,'" and thus is time-barred in a subsequent federal habeas proceeding. *Id.* at 416. The Court stated that a prisoner seeking state post-conviction relief instead could "avoid this predicament" by "filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted," and that a petitioner's "reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court." *Id.*

Carneal previously argued that the Supreme Court of Kentucky did not declare his entire petition untimely because it considered the merits of his RCr 11.42 motion as it related to his ineffective-assistance-of-counsel claims. A careful reading of the opinion, however, shows that the Supreme Court held that all the RCr 11.42 claims were time-barred, including the

ineffective- assistance-of counsel claims. *See Commonwealth v. Carneal*, 274 S.W.3d at 428 ("Therefore, Carneal's RCr 11.42 motion is untimely, as it was filed more than three years after his sentencing.").

The Supreme Court of Kentucky set forth this holding in a separate section of the opinion entitled "RCr 11.42 Claims--Timeliness." The fact that it also opined on the merits of a single claim does not mean that it excused Carneal's failure to comply with the state time limits. "[T]he state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds" of procedural default. *Michigan v. Long*, 463 U.S. 1032, 1041 (1983); *see also Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). "[A] state court need not fear reaching the merits of a federal claim in an alternative holding. . . . In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Harris*, 489 U.S. at 264.

Furthermore, it is true that *Pace* was not decided until April 27, 2005, almost a year after Carneal had filed his state collateral challenge in June 2004. At the time *Pace* was released, however, Carneal was deeply embroiled in a legal battle at the Kentucky Court of Appeals regarding the timeliness of his state filing. *Pace* should have placed Carneal on notice that if his state court petition was ultimately deemed untimely it would not toll the running of the habeas clock. Given the uncertainty surrounding the timeliness of his state filing, Carneal should have heeded the Supreme Court's warning by filing a "protective" petition in federal court at that time and asking that it be stayed pending exhaustion in state court.

Instead, Carneal failed to file anything in federal court for another three years and ten months. This is further evidence of Carneal's lack of due diligence. *See, e.g.*, *Lakey v. Hickman*,

633 F.3d 782, 786 (9th Cir. 2011) ("*Pace* also explicitly advised state prisoners . . . to file a protective federal petition to avoid a possible timeliness bar. Despite this warning, Lakey waited nearly five months before filing his federal claims."). Such a lengthy delay cannot be excused.

## VI. CONCLUSION

In conclusion the Court finds that: 1) the statutory deadline for Carneal to have filed a habeas petition expired on July 2, 2002; 2) while Carneal was mentally ill during the statutory time period, beginning in late 2002 and continuing through much of 2003 Carneal gained the insight and ability necessary to have filed a habeas petition; and 3) Carneal's failure to file anything until June 2004 shows a lack of diligence rendering equitable tolling unavailable to excuse his late filing.

Alternatively, even if Carneal was entitled to equitable tolling through June 2004 as he argues, his petition would still be untimely because: 1) the 2004 state filing did not restart the statute of limitations for filing a *federal* habeas action; and 2) because the state filing, deemed untimely by the Supreme Court of Kentucky, was not "properly filed," it did not suspend the running of the statute of limitations to file a federal habeas petition.

For these reasons, by separate Order, the Court will grant Respondent's motion to dismiss and dismiss this action as untimely filed.

## V. CERTIFICATE OF APPEALABILITY

In the event Carneal wishes to appeal any aspect of this Court's decision, he is required to obtain a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A district court must issue or deny and COA and can do so even though the petitioner has yet to make a request for such a certificate. *Castro v. United States*, 310 F.3d 900, 903 (6th Cir.

2002) ("Whether the district court judge determines to issue a COA along with the denial of a writ of habeas corpus or upon the filing of a notice of appeal, the district judge is always required to comply with § 2253(c)(2)&(3) by 'indicat[ing] which specific issue or issues satisfy the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

When a district court dismisses a petition on procedural grounds without addressing the merits of the petition, a COA should issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a plain procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the court erred in dismissing the motion or that the petitioner should be allowed to proceed further. *Id.*

The determination of whether to issue or deny a COA is always an awkward matter for a district judge. Obviously the Court would not have reached the decision dismissing this action as untimely filed unless it had spent considerable time in evaluating the issues and reaching a decision it felt was correct. The awkwardness comes from the fact that to deny the COA the court must find that no jurist of reason could find the Court's procedural ruling to be debatable. In making that determination in this case the law is rather clear. The decision process turned significantly on the distilling of some conflicting evidence and a determination of what the facts are and then applying those facts found by the Court to the law in this case. As noted, the Court believes it reached the correct decision. Nevertheless the decision has clear results as it dismisses the case. Certainly the stakes are high, and the Court does not want to unreasonably

hinder Carneal's opportunity to seek appellate review. While the Court does not believe the procedural ruling is debatable, it is reluctant to find that no jurist of reason could find to the contrary. Consequently, the Court will issue an COA on the issue of whether Carneal is entitled to equitable tolling under the facts presented in this case.

Date:

cc:     Counsel of record
4413.008